**FILED**

SEP 3 0 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**ENTERED**

OCT 0 1 2002



**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BRENDA CAMPBELL,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **CASE NO. CV-00-B-3161-S** |
| } | |
| **CHILDREN'S HEALTH SYSTEM,** } | |
| **d/b/a CHILDREN'S HOSPITAL,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Brenda Campbell is an employee of defendant Children's Health System, doing business as Children's Hospital. She alleges that defendant, in violation of federal law, discriminated against her on the basis of her race, African-American, and her sex, female, as well as in retaliation for engaging in protected activity, in violation of Title VII and 42 U.S.C. § 1981. She also alleges claims of outrage and negligent supervision, retention, and training under Alabama common law.

This case is currently before the court on defendant's motion for summary judgment (doc. 44) and defendant's motion to strike plaintiff's affidavit (doc. 56). Upon consideration of the record, the submission of the parties, and the relevant law, the court is of the opinion that defendant's motion for summary judgment (doc. 56) is due to be granted and defendant's motion to strike plaintiff's affidavit (doc. 44) is due to be denied.

## MOTION TO STRIKE PLAINTIFF'S AFFIDAVIT

Defendant has filed a motion to strike the affidavit of plaintiff. (Doc. 56.) "The rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion." *Lee v. National Life Assur. Co.*, 632 F.2d 524, 529 (5th Cir. 1980).[1]   The court finds that the motion to strike the affidavit is due to be denied.  The court has considered the admissible portions of the affidavits when relevant in deciding the motion for summary judgment.

## MOTION FOR SUMMARY JUDGMENT

### I. FACTUAL SUMMARY[2]

Plaintiff Brenda Campbell is an African-American female.  At all relevant times, defendant Children's Health System, doing business as Children's Hospital, employed plaintiff as a registered nurse.

In March 1998, defendant promoted plaintiff to the position of charge nurse for the 3East Unit.  The charge nurse is responsible for supervising registered nurses, clinical

---

[1]Decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

[2]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff. *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

assistants, and unit clerks; evaluating the personnel she supervises; assigning patients; scheduling; and taking patient assignments as required by staffing needs.

Kimberly Booker (African-American female), Head Nurse, told plaintiff that the 3East Unit was a problem unit. She told plaintiff that the staff on the 3East Unit had problems getting along and that they had difficulty with authority.

On her 1998 evaluation, Booker noted that plaintiff had a "negative attitude." She noted, "By feeding into the 'gripe sessions' of the staff, Ms. Campbell encourages these sessions and does not help boost morale in the least. This is an area that must improve if Ms. Campbell is to remain in this role." (Doc. 45, Exh. 4, exh. 7.) Plaintiff agreed that other nurses could have perceived plaintiff's encouragement of gripe session as "negative." (Doc. 45, Exh. 4 at 139.)

In July 1999, pursuant to a restructuring of certain supervisory positions, Scotty Roberson (white male) replaced Booker as plaintiff's supervisor. Roberson testified that he had noticed plaintiff had problems performing her job duties as Charge Nurse. He also had "consistent complaints from the night shift regarding Campbell's failure to communicate and work with them regarding scheduling issues." (Doc. 45, Exh. 3 ¶ 3.) Roberson and Beverly Barrett (white female), Roberson's supervisor and Divisional Director, met with plaintiff on July 9, 1999, as an "intervention." (*Id.* ¶ 4.) They discussed with plaintiff the performance problems Roberson had observed.

Plaintiff contends that the only "specific examples" of performance problems were (1) "they had a problem with my going to lunch with only African-American nurses;" (2) "I

3

did not smile enough when talking to white employees;" and (3) "I was more lenient on African American employees than white." (Doc. 65, ¶¶ 8-9.) However, plaintiff understood that Roberson and Barrett had discussed six areas of concern regarding her performance as Charge Nurse during this meeting. (Doc. 45, Exh. 4, exh. 15 at 772.)

Roberson and Barrett placed plaintiff on a "90-day probationary period," during which she would be required to "consistently meet all expectations" set forth as her objectives. (*Id.* at 770-71.) Her objectives were:

1.  Demonstrate positive interpersonal relationship skills in problem-solving and interacting with [s]taff regarding all issues i.e., scheduling assignments and communications. No legitimate complaints from staff concerning the Charge Nurse's [plaintiff's] interaction with them during normal professional communications and problem-solving.

2.  Communicate to Head Nurse all appropriate information regarding identified problems of staff as evidenced by: Communicating to Head Nurse unsatisfactory performance, attendance or other employee issues with appropriate follow-up/intervention. There are no unreported employee related problems.

3.  Make assignments balanced with all employees including making accommodations for lunch according to [U]nit needs.

4.  Facilitate teamwork & team environment as AEB: Charge Nurse and employees assisting one another as needed. No refusals to assist others.

5.  Motivate/encourage staff movement toward positive outcomes concerning the Unit; their contributions to the Unit and the health system. Focus on the positive aspects of the Unit. Charge Nurse should show a positive attitude toward work and co-workers.

6.  Follow directions from Head Nurse i.e., complete time cards as directed. Assign or not assign relief charge as directed.

4

(*Id*. at 771.) Plaintiff understood that she would be "relieved from her Charge Nurse role and placed in a Staff Nurse position" if she failed to meet these objectives at any time during the probationary period. (*Id*. at 770.)

Plaintiff's next day at work, during the morning report,[3] she was asked by an employee on the Unit, "[W]hat's going on?" (Doc. 45, Exh. 4 at 231.) Plaintiff responded, "The reason why this is going on, I was – I was accused of something that concerned me. . . . Basically, I've been painted as some type of racist." (*Id*.) Several nurses reported this statement to Roberson and told him that it made them uncomfortable. Roberson and Barrett determined that the statement violated the July 9th objectives, and, on July 16, 1999, Roberson and Barrett demoted plaintiff from Charge Nurse to Staff Nurse III position.

After plaintiff's demotion, the charge nurse duties were performed by two staff nurses working as relief charge nurses – Angela Jones (African-American female) and Lou Ann Standifer (white female).

Plaintiff filed a grievance regarding her probation and her demotion on July 29, 1999. (Doc. 45, Exh. 4, exh. 17.) Plaintiff's grievance was not considered by defendant as it was untimely filed. (Doc. 45, Exh. 6 at 283, 295-96; Doc. 45, Exh. 1, exh. C (grievances must be filed within five days of the event).) Also, Joyce DuPree (African-American female), Employee Relations Manager, testified that plaintiff's probation and demotion were not grievable because such decision are not based on violations of company rules; rather,

---

[3]The morning report is a meeting between shifts wherein the Charge Nurse reports the condition of every patient to the nurses working the following shift. (Doc. 45, Exh. 4 at 169.)

"[W]hen a manager decides to put you on probation or demote you, that's based on some criteria that manager has established." (Doc. 45, Exh. 6 at 302.)

Plaintiff filed an EEOC charge on September 21, 1999, alleging that defendant placed her on probation and demoted her on the basis of sex and race. (Doc. 45, Exh. 4, exh. 10.)

On November 4, 1999, plaintiff told Robin Greer (white female), the relief charge nurse at the time, that she was going to a meeting (Grand Rounds) and asked Greer to watch her patients. Plaintiff told Greer that her "patients were all the same and fine." (Doc. 45, Exh. 4 at 251-52.) Greer testified that plaintiff did not tell her that she had a patient returning from surgery and she did not tell Greer the patient's condition. (Doc. 45, Exh. 7 at 25-26.) Plaintiff contends that she told Greer that the patient was returning from a biopsy. Greer reported the incident to Roberson, who issued a written warning for violation of defendant's policies prohibiting "willful inattention to patient care" and "failure to show respect in [management/employee relations]." (Doc. 45, Exh. 4, exh. 24.)

The written warning stated:

> Ms. Campbell reportedly told the relif [sic] charge nurse (Robin Greer) that she was going to Grand Rounds and that she needed to watch her patients. Reportedly, Ms. Campbell did not request nor get prior approval to attend the meeting. Ms. Campbell did not tell the relief charge nurse that she had accepted report on a patient from surgery. Several minutes after Ms. Campbell left the floor, her patient came up from PACU. The relief charge nurse received no report or information from Ms. Campbell concerning Ms. Campbell's patient. The relief charge nurse also had a full patient load of her own.
> . . .
>
> Further infractions of health systems rules will result in further disciplinary action inclusive of termination.

6

(*Id.*)

>   Plaintiff objected to the discipline.  She wrote on the warning form:

>   I don't agree with the above statement.  This is just a continued form of harassment on my supervisor's part.  He continue[s] to accept reports of wrongdoing from others and does not feel he has a duty to talk with me as he does other employees.  His expectations of me are clearly different than what he expect[s] from his other employees.

(*Id.*)  Plaintiff timely submitted a grievance for this discipline.  (*Id.* Exhs. 22-23.)

On December 16, 1999, the grievance panel reviewing this incident determined that

the discipline imposed was too severe and that the written warning should be removed from

plaintiff's personnel file.  (Doc. 45, Exh. 6, exh. 22 at 823.)  The panel found:

>   We are aware of the communication problems Brenda has been counseled on, but in this instance it seems Brenda communicated adequately before she attended Grand Rounds.  After talking to the charge nurse involved in this incident, it became apparent that she was not clear on the scope of her authority.  She could have told Brenda at any time that she could not attend Grand Rounds because of the changing state of the unit.  Since the incident, the charge nurse has clarified her duties with her supervisor.

>   When Brenda requested to go to Grand Rounds she might not have asked in a polite way.  The charge nurse says Brenda just told her she was going; she did not ask at all.  Brenda says that she did ask.  No matter what the facts are, the panel feels that the Group II violation is too harsh.

>   There are obviously some problems between Brenda and her superiors.  But from the history of Brenda's clinical duties, there is every indication that she is a good nurse.  She has been at CHS almost fifteen years.  The panel feels she deserves a chance to transfer to another unit.  There seems to be so much hostility between all parties involved that we don't think the situation on that unit will get any better.

(Doc. 45, Exh. 22 at 823.)  As a result of the decision of the panel, the written warning for

the November 9, 1999, incident was removed from plaintiff's personnel file. (Doc. 45, Exh.

1 ¶ 14.)

Plaintiff received a second written warning for failing to show respect in management

and employee relationships on December 15, 1999.  This written warning stated:

> On 12/6/99, reportedly, Brenda Campbell was observed informing Robin
> Greer (Charge Nurse), "There is a meeting about paid time off today and I will
> be going at 1:30." Reportedly there was no discussion and Ms. Campbell also
> "stated the above with hatred and animosity in her tone and facial expression."
> It was also reported that Robin Greer said nothing in response to these
> actions/statements. Ms. Campbell has been instructed/counseled on several
> occasions (9/15/99 & 11/10/99 pertaining to the appropriate manner in which
> to interact with the Charge Nurse when requesting to leave the unit for
> inservices/meetings and how important it is to ensure adequate communication
> will occur to ensure continuity/quality patient care.)
>
> . . .
>
> This is a written warning. Ms. Campbell needs to understand that this
> continued behavior will not be tolerated and additional incidences will result
> in further action, inclusive of termination.  According to hospital policy, 3
> written warnings within 18 months may result in termination. (Ms. Campbell
> now has 1 verbal and 2 written warnings).

(Doc. 45, Exh. 4, exh. 26 at 31.) Plaintiff indicated on the warning that she signed it "under

duress." She further objected to the discipline by stating:

> I disagree with the accusation of going to a mandatory benefit meeting without
> asking the lead nurse[s,] Robin Greer, RN, and Holly Russell, RN, as a witness
> as these two nurses are friends.  These mandatory meeting[s] are very
> important and I feel that directors should have told the people in charge to set
> times as to who would attend each day so no one would get into trouble.

(*Id.* at 33.)

On December 15, 1999, Plaintiff filed a grievance as to the December 6, 1999, written warning. (Doc. 45, Exh. 4, exh. 27.) Plaintiff's grievance states that Greer does not relate to plaintiff as she does other nurses and that Greer is anxious in the supervisor position, which "is reflected on [plaintiff]." (*Id.*) She states, "Other staff just say watch my [patient] I'm going to a meeting and its OK, but not me." (*Id.*) When asked to describe the solution or remedy she desired, plaintiff stated:

1. I don't want separate standards on unit.

2. I would like for all nurses to report off the same way.

3. I would like for staff, Beverly Barrett and Scotty Roberson to attend hostile work environment classes. Sensitivity classes among other races.

4. I would like all [hearsay] to be eliminated, or at least treated the same way among employees. Some [hearsay] carr[ies] more weight for some than others.

5. I would like for a complaint to be heard from both sides.

6. Proof should be provided when a person is accused of something and not just [hearsay].

7. Director should make all lead nurses aware [of] important meeting and have assigned times to attend so that one nurse does not feel they have to beg to go to an inservice.

8. If I am expected to remain on the unit all the times like a slave with the exception of breaks, lunch and meeting, I would like all nurses to do so.

9. Directors have to[o] much involvement in who gets written up and who [doesn't].

10. The hospital need[s] outside grievance committee.

.

9

> 11. Director should be told or assisted in resolving problems before they get
> to this magnitude because if I had been respected as a person . . . and not . . .
> slandered or accused, it would be over.

*(Id.)*

During December 1999, Human Resources Consultants Betty Klie (white female) and
William O'Neal (African-American male) conducted an investigation into the working
conditions and morale in 3East Unit.  Based on the results of this investigation, Barrett
determined that the best interests of the unit and of plaintiff compelled plaintiff's transfer to
another unit.  On January 20, 1999, Barrett transferred plaintiff to the Special Care Unit as
a Staff Nurse III.  The transfer was a lateral transfer and did not result in any change in
plaintiff's pay or the terms and conditions of her employment.  However, plaintiff is required
to work every other weekend.

Barrett and Roberson reported an increase in morale and harmony on 3East Unit after
plaintiff's transfer.

Plaintiff filed a grievance regarding her transfer to the Special Care Unit.  Doc. 45,
Exh. 4, exh. 31.  She stated that her "forced transfer" was retaliation.  *Id*.  She asked to stay
on 3East Unit and to "remain free of retaliation."  *Id*.  She also stated:

> 3. I wish the opportunity to defend myself and not be simply accused by
> anyone.
>
> 4. 3East and its director need to attend diversity class with special attention
> to customs of other races in order to respect our differences in the work place.
>
> 5. I wish not to be slandered if I choose to come to work and do my job and
> leave.

6. I want my personnel record free of all written and verbal warnings and other negative material since 9/99.

7. If I am not going to be given a choice concerning the transfer, I would like in writing from Beverly Barnett her help in finding a job that will work into my life style and to return to 3East 7 a.m. - 7 p.m.

8. I wish that all people are treated the same when it comes to disciplinary action. I want an apology from Scotty Roberson and Beverly Barnett and 3East staff members who have been a part of this process.

(Doc. 45, Exh.4, exh. 31.)

On February 24, 2000, Employee Relations Manager DuPree responded to plaintiff's

outstanding grievances regarding the December 1999 written warning and her January 2000

transfer. (Doc. 45, Exh. 4, exh. 32.) She wrote:

Per Policy, almost any offense is grievable. There are some remedies that are outside of our control, are unobtainable, and even if provided don't change anything. For example, sometimes an employee may ask for "an apology" – this is something that is outside of CHS control and, as you may well know, even if a grievance panel suggested that someone should say they were sorry, what meaning would it have? And, would it fix the problem?

What you are asking for as a remedy is similar to the above example. Your return to 3East is not an option. Beverly Barrett as Divisional Director can place her staff where she feels they would better serve the organization, consistent with CHS policies, she has done so. Additionally, an apology from Scotty, Beverly and the 3East staff would not alter the fact that your move to Special Care will stand, nor would it resolve any issue that occurred on 3East.

You offer several suggestions as to how Scotty should direct 3East. Scotty is the director and thus, he is accountable for how the unit runs. He must function within CHS guidelines and thus cannot allow anyone to leave the unit as they see fit without considerations for patient care. At the same time, no one on the unit is treated "like a slave." All staff receives scheduled breaks and can attend hospital Inservices as staffing permits without jeopardizing patient care.

You mention that you want to "remain free of any other retaliation." Your transfer to the Special Care Unit was not retaliation. It was simply a decision made by Beverly to give you the opportunity to start anew following the conflicts which occurred on 3East.

You also mention that the entire 3East staff along with Scotty needs to attend a diversity class. Although Scotty's supervisors disagree with your complaints about Scotty, HR is presently rolling our "Civil Treatment" classes for both managers and employees. This is something that I would also recommend that you attend. The course's focus is on conduct that fosters team spirit and productivity.

Brenda, it is our intent to have a productive work force at all times. Personality conflicts can tend to hinder patient care. This decision to transfer you was meant to place you in an environment where you felt challenged so that you could remain a productive member of the healthcare team at CHS. Also, to remove you from an environment where you felt that no one could be trusted.

For these reasons, your request to return to 3East can not [sic] be granted.

(*Id.*)

Plaintiff now reports that she is happy and enjoys working on the Special Care Unit.

(Doc. 45, Exh. 4 at 348.)

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his

burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. <u>DISCUSSION</u>

Plaintiff's complaint alleges the following claims: (1) race and sex discrimination with regard to her probation and demotion; (2) race and sex discrimination with regard to her written warnings and transfer; (3) retaliation with regard to her written warnings and transfer; (4) common-law negligent training, supervision, and/or retention; and (5) common-law outrage.

## A. Probation and Demotion – Race

Plaintiff contends that defendant placed her on probation and demoted her from her position as Charge Nurse because of her race, African American.  Defendant argues that plaintiff cannot establish a prima facie case of discrimination with regard to her probation and demotion, and, assuming a prima facie case, plaintiff cannot establish that the articulated, non-discriminatory reasons for its decisions are pretext.

This is a circumstantial evidence case.  The circumstantial evidence standards are well established:

> *McDonnell Douglas*[4] and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .
>
> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional

---

[4]411 U.S. 792 (1973).

> discrimination by showing that the employer's proffered explanation is unworthy of credence. Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 142-43 (2000)(internal citations and quotations omitted, footnote added).

For purposes of deciding defendant's motion for summary judgment only, the court assumes that plaintiff can establish a prima facie case of race discrimination related to her probation and demotion. However, the court finds that plaintiff has not presented sufficient evidence to demonstrate that defendant's articulated reasons for her probation and demotion are a pretext for race discrimination.

Defendant contends that plaintiff was placed on probation for numerous performance deficiencies in the areas set forth above as the Charge Nurse Objectives. Plaintiff contends that the reasons asserted for her probation are pretextual because, during the meeting of July 9, 1999, Roberson and Barrett told her that the two reasons for her probation were that she did not smile enough and that she ate lunch with other black employees on a daily basis. Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 17. She argues, "The defendant's reason must be limited to what was imparted during the meeting of July 9, 1999, as these statements accurately reflect what was in their minds at the time the decision was made." *Id.* However, plaintiff admitted, in documents prepared shortly after the meeting, that Roberson and Barrett raised "six concerns" at the meeting. Doc. 45, Exh.

15

4, exh. 15 at 772. Plaintiff's argument that Roberson and Barrett only voiced two concerns to her at the meeting is disputed by her statements made shortly after the meeting. The evidence in the record demonstrates that defendant's articulated reason for placing plaintiff on probation was the perception that plaintiff failed to meet the six Charge Nurse Objectives.

Moreover, the evidence in the record demonstrates that defendant demoted plaintiff because Barrett and Roberson believed, based on information received from 3 East Unit staff members, that plaintiff, while on probation, failed to meet two of the Charge Nurse Objectives. Specifically, they considered that plaintiff had failed to interact positively with the staff and had failed to provide a positive work environment, as demonstrated by her comments to members of her staff, which were overheard by other members of her staff, about being "painted a racist."

To establish that the articulated reasons for defendant's decisions to place her on probation and to demote her are a pretext for race discrimination plaintiff must produce sufficient evidence to allow a fact finder reasonably to conclude, at a minimum, that the each of the proffered reasons did not actually motivate the defendant. *See Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir.2000) (en banc); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997). Plaintiff may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir.1996); *see also Reeves*, 530 U.S. at 148. Proving pretext requires more than showing that the employer was

wrong in its assessment of the underlying facts or was otherwise lacking in wisdom.  As the

Eleventh Circuit has explained, federal courts

> do not . . . sit as a superpersonnel department that reexamines an entity's
> business decisions.  No matter how medieval a firm's practices, no matter how
> high-handed its decisional process, no matter how mistaken the firm's
> managers, [federal anti-discrimination laws] [do] not interfere.  Rather, *our
> inquiry is limited to whether the employer gave an honest explanation of its
> behavior.*

*Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470

(11th Cir.1991))(emphasis added).  "Evidence showing a false factual predicate underlying

the employer's proffered reason does not unequivocally prove that the employer did not rely

on the reason in making the employment decision.  Instead, it may merely indicate that the

employer, acting in good faith, made the disputed employment decision on the basis of

erroneous information."  *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th

Cir.1995) (Johnson, J., concurring specially).

Thus, for plaintiff, creating a genuine issue of fact regarding pretext is not a matter

of simply presenting sufficient evidence to allow a jury to find that some hypothetical,

objectively reasonable employer would have considered her actual work performance to be

satisfactory in the areas of asserted deficiency.  Rather, she generally must offer sufficient

proof to allow a finding that Roberson and Barrett – the decision makers – did not believe

that her work performance was unsatisfactory in the areas set forth as Charge Nurse

Objectives, or that her comment about being "painted a racist" did not violate the terms of

her probation. *See Walker*, 53 F.3d at 1564 & n. 7; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363-64 (11th Cir.1999).

Roberson and Barrett testified that their concerns about plaintiff's job performance followed from reports of staff members. Where the decision maker relies upon a subordinate's report alleging that a plaintiff's performance was deficient, to demonstrate pretext a plaintiff must point to evidence that suggests that the decision maker either did not rely on that report or that the decisionmaker did rely upon the report but knew it was false. *Cf. Sweeney v. Alabama Alcoholic Beverage Control Bd.*, 117 F. Supp. 2d 1266, 1272-73 (M.D. Ala. 2000) (discussing proof of pretext where the employer relies upon a subordinate's report that the plaintiff violated a work rule).

Plaintiff has not presented evidence to demonstrate that she was meeting the Charge Nurse Objectives prior to being placed on probation and that this fact was known to Barrett and Roberson. She has not presented evidence that Barrett and Roberson did not rely on reports from subordinates and/or their own observations to determine that plaintiff's job performance was deficient. Moreover, there is no evidence before the court that plaintiff did not make the comment referenced above or that Barrett and Roberson did not believe that the comment violated her the terms of her probation.

Simply, plaintiff has not presented evidence sufficient to establish that defendant's articulated reasons for placing her on probation and demoting her (1) have no basis in fact, (2) did not actually motivate defendant, or (3) were insufficient to motivate defendant. *Walker*, 53 F.3d at 1564 (Johnson, J., specially concurring). Defendant's decision to place

18

plaintiff on probation and to demote her seem to plaintiff to have been unfair, but the court finds that plaintiff has failed to show substantial evidence that defendant's account of its reasons for its decisions is unworthy of credence. *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *England v. United Insurance Company,* 97 F. Supp. 2d 1090, 1101 (M.D. Ala. 2000).

Therefore, defendant's motion for summary judgment as to plaintiff's race discrimination claims based on her probation and demotion are due to be granted. Such claims are due to be dismissed.

### B.  Written Warnings and Transfer – Race

Defendant contends that the written warnings in November and December of 1999 and the lateral transfer are not adverse employment actions that are actionable under § 1981 or Title VII. The Eleventh Circuit has held that an adverse employment action is an essential element of claims of discrimination and retaliation. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). "[T]o prove adverse employment action . . . an employee must show a serious and material change in the terms, conditions, or privileges of employment," and that "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* at 1239.

Whether an employer's decision affecting an employee constitutes an actionable adverse employment action turns on whether a reasonable person would have found the decision to be adverse to their employment. The Eleventh Circuit has held that a plaintiff

must show that "a reasonable person in [plaintiff's] position would have found [the decision] to be adverse under all the facts and circumstances. *Doe v. DeKalb County School District*, 145 F.3d 1441, 1453 (11th Cir. 1998). Among the facts and circumstances affecting whether the change is considered "adverse" are whether the change results in "lesser pay, responsibilities or prestige," and whether the change would "impede an employee's professional growth or advancement." *Id.* at 1452.

Plaintiff contends that her transfer to the Special Care Unit was an adverse employment action. Based on the "reasonable person" standard, "a ***purely*** lateral transfer is not an adverse employment action." *Id* at 1450 (citing, *inter alia*, *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). Plaintiff's transfer was a lateral transfer with no resulting loss of pay, responsibility, or prestige. Although plaintiff was required to work every other weekend, the court finds that change was not a serious and material change in her job conditions. Therefore, the court finds that plaintiff's transfer to the Special Care Unit was not an actionable adverse job action.

Plaintiff contends that the two written warnings, which she received in November and December of 1999, are actionable adverse employment actions "because they counted against the plaintiff pursuant to the progressive discipline policy and because they resulted in the plaintiff being transferred and ultimately being required to work weekends." (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 19.) First, the court notes that the November 1999 written warning was removed from plaintiff's file; therefore,

20

it cannot be "counted against" plaintiff in any manner and cannot have caused a serious and material change in her working conditions.  Moreover, possible future adverse consequences of the December 1999 written warning are not actionable without allegations and/or proof that the written counseling "trigger[ed]" some other "tangible job consequences." *See Davis*, 245 F.3d at 1241 (citing *Merriweather v. Alabama Dept. of Public Safety*, 17 F. Supp. 2d 1260, 1275 (M.D. Ala. 1998).  Because the court finds that the transfer was not an adverse employment action, the written warning, even if the court assumes it was the reason plaintiff was transferred,[5] is not an actionable employment action.

Thus, defendant's motion for summary judgment is due to be granted as to plaintiff's race discrimination claims based on the written warnings and her lateral transfer.  Such claims are due to be dismissed.

## C.    Negligent Retention, Supervision, and Training

Plaintiff's negligent retention, supervision, and training claim, as set forth in her complaint, is as follows:

> Defendant, Children's Health System, d/b/a Children's Hospital was negligent in failing to properly train and/or supervise their employees in supervisory positions, including the Head Nurse in such a [manner] as to prevent the racial discrimination which proximately caused injury to the plaintiff.

---

[5]The record does not support plaintiff's assertion that her transfer was the result of her written warnings.  The evidence in the record supports only the conclusion that Barrett transferred plaintiff because she determined that it would relieve the stress on 3East Unit.  Doc. 45, Exh. 2 ¶ 10; *see also* Exh. 4, pp. 341-43, exh. 30 (Memo from Barrett to plaintiff)("Regardless of who is at fault, the working relationships on 3East are strained and compromised to the point that we are not able to effectively deliver care.  It is my decision to transfer you to a new unit effective immediately.").

> The defendant was negligent in retaining employees who harbored racial animus and ill will toward people of color and who were in a position of authority over plaintiff.  Said retention proximately caused injury to the plaintiff.

Doc. 1, ¶¶ 48-49.  Apparently, plaintiff contends that Roberson was incompetent because he discriminated against her, and possibly others, on the basis of race, and defendant failed to properly supervise and train Roberson in order to prevent such discrimination.

In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law, Alabama tort.  *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 824 (Ala. 1999)(citing *Big B, Inc. v. Cottingham*, 634 So.2d 999 (Ala.1993)).  Plaintiff complains that her injuries were caused by Roberson's racial animus that defendant failed to prevent.  *See* Doc. 1, ¶¶ 48-49; Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, pp. 19-20.  As Alabama does not recognize a common-law tort for discrimination in employment,[6] the court finds that plaintiff cannot maintain an action for negligent supervision, training, and/or retention based upon conduct that is allegedly employment discrimination, but does not support a common-law tort.

---

[6]*See Machen v. Childersburg Bancorporation, Inc.*, 761 So.2d 981, 983 n.1 (Ala. 2000)("It is well settled that Alabama does not recognize an independent cause of action for sexual harassment.  Instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage. *See, e.g., Ex parte Atmore Community Hosp.*, 719 So.2d 1190 (Ala.1998); *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885 (Ala.1995); *Big B, Inc. v. Cottingham*, 634 So.2d 999 (Ala.1993); *Potts v. BE & K Constr. Co.*, 604 So.2d 398 (Ala.1992).");  *see also Howard v. Wolff Broadcasting Corp.*, 611 So.2d 307, 313 (Ala. 1992)(refusing to "judicially create a wrongful discharge action" based on sex discrimination), *cert. denied*, 507 U.S. 1031 (1993).

Therefore, defendant's motion for summary judgment as to plaintiff's negligent supervision, training, and retention claims is due be granted.

**D.    Other Claims**

Plaintiff's complaint contains claims for sex discrimination, hostile environment racial harassment, and outrage. Plaintiff has offered no evidence or argument in support of these claims. Therefore, the court finds that plaintiff has abandoned her claims of sex discrimination, hostile environment racial harassment, and outrage. *See Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994). Defendant's motion for summary judgment is due to granted as to these claims and such claims are due to be dismissed.

**IV. CONCLUSION**

For the foregoing reasons, the court finds that there are no disputed issues of material fact and that defendant is entitled to judgment as a matter of law. Defendant's motion for summary judgment is due to be granted. An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this ___30th___ day of September, 2002.

*Sharon Lovelace Blackburn*

**SHARON LOVELACE BLACKBURN**
United States District Judge

23